Our next case is the same parties, Centripetal Networks v. Palo Alto Networks, 23-1785, Mr. Hanna, I think.  All right, your honors, may it please the court, and I'll stick to my time this time, I apologize for that, your honor. But, in this case, the board's decision should be reversed, or at least remanded, because the board, when you analyze the evidence, really provided a results-driven decision. It changed the construction of the term boundary, and it completely ignored documentary evidence from an installation guide, which proved that petitioner's read was impossible. It was documentary evidence, and it was completely ignored by the board. The board didn't touch it. We'll get into specifics, but this was an issue that was argued extensively at the oral hearing. Let me just set the stage to change. We're still dealing with source fire here. But instead of dealing with the issues that we were just talking about, we're talking about the placement of what's called these sensors. They're going to be used by source fire for a variety of functions. Now, the claims at issue here require that you have to have a device that's at a boundary between a protected network and an unprotected network. And petitioner submitted his petition, they gave their explanation of the art, and they actually drew a figure, and they submitted it. The figure was wrong. They drew the figure wrong. They misunderstood how source fire worked. And to support that, we submitted evidence of an installation guide. And what that installation guide said, and it even used the precise language of the claims almost, it said, you can't have these sensors at a boundary. You must isolate the sensors. You must. I think we can all agree that when it comes to prior art, the word must is a very, very strong word. So you must isolate the sensors. And how did we explain why you do that? You do that because if you have these sensors... Isolate the sensors from what? You have to isolate the sensors from an unprotected network. It has to be within the protected network. So can you, within the network and isolate? So what do you do about your figure 2A with a tap? So figure 2A with the tap. So there's something between, according to this drawing, the boundary to the dangerous outside world and the network sensor in the box. It doesn't have to be the very first thing. You can have some kind of gate in there between. Well, a tap, what a tap does is it merely... But if that's right, then your argument... This piece of your argument depends on saying a router is not a tap. Well, a router is definitely not a tap. But I think a tap is part of the inspection device in that figure. And that's what we laid out. Because all a tap does is it's going to just duplicate the traffic and send it up to the device that's at the boundary. And if you look at the specification, that's exactly what it does. So it is sitting... So when you look at that figure, that network device, they have taps on two sides of that network device. That's so that the device that's analyzing the traffic is sitting at the boundary. Because that network device could be a firewall, it could be a router, it could be a variety of things. And you're going to be able to analyze this traffic at the boundary before and after in order to analyze the traffic. So that's what figure two is showing. And to answer your earlier question in terms of with the sensor, why do you have to have the sensor? So if you go to 9252, and this is the key portion that we cite for this... that we cited in the IPR and we cited that route. This is where it should describe... This is your isolated... I'm sorry, 9252. I'm sorry? This is your isolated... Correct, yes. I think it is 9252. Yeah, and what it says specifically, it says, To secure the data, you must isolate the sensors and defense center from unprotected networks. Right? I mean, that's essentially the language of the claims. The claims... But there is a sentence before that. And that's what the red brief of 55 points us to. And suggests that this is just in one very specific embodiment, I think, where you're geographically dispersed. Right. Suggesting that if you're not geographically dispersed, you don't have to worry about whether your sensors are in the protected or unprotected network. What's your response to that? My response to that is that all the documentary evidence otherwise shows that the sensors have to be behind at least a router. Because if you don't have that sensor... If you have that sensor in an unprotected network, it's going to get attacked. It's going to get attacked by hackers. They're going to flood that thing because it's not doing anything but just sensing the traffic. And so if you have that outside of your protected network, it's going to be constantly attacked. And so when it's talking about this geographic disbursement, that's saying, okay, I'm not going to have a... In the other diagram, it shows a router, and then it can show the sensor behind the router. Right. If you're going to have a geographically diverse, you have to have them in the unprotected networks behind two different routers. And so it's just ensuring that. But it's just... It's cementing home the fact that you have to have these sensors behind some type of protection device. But the board finds that at least sometimes in source fire, the sensors are not behind a router. Is that correct? No. Is it correct that the board made that finding? No, I don't think so. I don't think they ever made that finding. What they've tried to... And so my reading of it, anyway, is that what the board said was the unprotected network... I mean, the boundary between the protected network and the unprotected network could be behind a router. And that's being... It could be within the protected network from your perspective. Which is what you disagree with. That's what they said. And I think that's technically wrong, factually wrong, and it's contrary to what the claims say. The claims say it has to be at the boundary between the protected and the unprotected network. And these sensors, they have to be behind a router. In another example, if you had the sensor... I'm sorry. When you say behind, I'm not immediately summoning up the image that I think you have clearly in your mind. And further away, that the router is between the wilds and your... Correct. The router is between the Internet... Yes, that's it. Like your home. I'm assuming your home. But your home has a router, right? It's between the Internet and your computer that you have for your home office or something of that nature. So when I say behind the router, I mean your router's in front and it controls access to the Internet. Outward facing. Outward facing. And then behind that is your protected network or your home office or something behind it. So that's what I mean by behind. You think that in SourceFire, the router is always at the boundary between the unprotected Internet and the protected network. Yes, 100%. I mean, every single diagram that they refer upon... I mean, we can go to Appendix 30, which is... It happens when you get two of these back-to-back. So if you go to Appendix 30, this is one of the diagrams that the board relied upon. First of all, this was not relied upon in the petition. So granted, and Judge Stark, you actually said earlier, is this something that the board just came up on its own without a record to support it? I think this is a clear case of that. That they came up with this on its own. And this is why I referred to a results-driven decision in this case. But here you can say this is their primary figure that they relied upon. Just to be clear, the board here is citing your patent owner response? No, the board is citing a different page of a document that was introduced and was not in the petition here. But at least purport to be citing to 40 to 41 of your... Oh, right, right, right. But I'm saying it was not in the petition. It wasn't in the petition cited to support this element. What they did is they actually provided a diagram that was incorrect in terms of where the boundary was. But then you submitted this additional guide, correct? The installation guide, correct. And are you questioning the board's authority to rely on what you submitted in your response? Well, I think that they can rely upon that and they can discuss it. But my point is this figure was not relied upon in the petition and it was an incorrect figure. So the board tried to fix it with this figure is my point. But in any case, yes, you're right. This is citing our patent owner response. But as you can see here, the IPS, that's what we're talking about, the sensor here, is behind the router. And just, Ron, when you said... I was trying to illustrate with your home. When I say behind, I mean it goes internet, router, and then the tap. And then the tap goes to the IPS. So in every instance, it's going to be behind this router. And that's consistent with what SourceFire says. SourceFire actually says that the router is the first line of defense. That happens on Appendix 9244. And that makes sense because the router, what it's going to do is, first of all, it's going to protect your internal network from attackers because it's going to hide the IP addresses or the internet protocol addresses that are within your network. If you were completely exposed, someone could go and compromise different aspects of your network. And so that's another reason that this sensor has to be behind the router and it's behind that first line of defense. So it's never going to be at the boundary. And so that's why we submitted the installation guide and whatnot. And just so you know, I didn't see any figures or anything in the record that will actually put the sensor in front of that router. The red brief also argues that while you challenged where the boundary is actually located in SourceFire, you did not argue that it would not have been obvious to locate it between the protected and the unprotected networks. That is, they're saying even if SourceFire doesn't expressly disclose the limitation, as you would understand it, it would render it obvious to want to steal the art. Did you contest that? Absolutely. We did contest it. I would contest it. It goes to what I alluded to earlier when we said that if you have it outside the router, then those sensors are going to be attacked. Those IP addresses are going to be known to hackers. And if you can hack what's supposed to be sensing malicious traffic, you're going to get into that network. That's number one. Number two is we cited at Appendix 568, this is Dr. Goodrich's textbook, and there he explains how any intrusion prevention sensors are going to be within protected networks for that same reason. So we absolutely would contest that. I know I'm getting late into my time, so I'd like to reserve unless you have questions. We will do that. Okay, thank you. Mr. Ratz. Thank you, Your Honors, and may it please the Court. I'd like to start with this notion that SourceFire discloses only locating the 3D sensor, which is the packet filtering device, behind a router. And that is both factually incorrect, but also irrelevant to what the claim language requires in view of the specification. So I'd like to start with the SourceFire reference itself that was our ground, not the installation guide, which is something that the patent donor brought up in their response. That's a separate document with a later date. The SourceFire reference itself, this is at Appendix 1526, contains an image of the location of a 3D sensor. This is the figure that we included at our petition at Appendix 144 to 145 that we edited. Did the Board end up relying on this? The Board cites their argument that we mislabeled. This is at Appendix 27. The Board discusses their argument that we mislabeled this figure and then says that argument was unavailing. So they rejected the notion. This is, again, at Appendix 27. They said it's unavailing that we mislabeled this figure. Just by the way, to the extent they've suggested in their briefing that you didn't dispute that you made a mistake in the drawing, you do dispute that, correct? Absolutely. We disputed that in our petition reply. We said their relabeling was arbitrary, and we discussed this at length at the oral hearing. I presented the argument. I explained exactly what we explained in our red brief here, which is that... The caption here makes clear that the host is the protected internal. Exactly. It's a host. They say that the host at the bottom is actually the broad Internet. There's no way to read that. So what we have here is that the first device between the Internet at the top and your internal network is the 3D sensor. So them saying there's absolutely no documentary evidence of this being the first device is contrary to the express teaching on Appendix 1526 of the source FHIR reference that we relied upon. The explanatory text could not be clearer. It also says that under the figure that the different interface pairs, which is within the 3D sensor, is the interface between the two networks. So we know that this is an express example of source FHIR disclosing it being the first device between the unprotected network, the Internet, and your protected network. The board then went on to address their arguments about the installation guide. It's critical that what the board said that they omitted from what their argument was is the same thing that counsel omitted today. So this is at Appendix 31 of the final written decision. This is discussing the installation guide, that separate document, where it has different explanations of where the 3D sensor can go. And the 3D sensor can go outside of a firewall or inside of a firewall. And it says it on Appendix 31. And this is in reference to the figure that's at the top of page 30, which is 9253, 43, right? That is right. And that figure was included in their patent owner response. That's why the board was addressing it. We did not use the installation guide, because that was not part of our ground. But we nevertheless addressed it, because they brought it up. But what the installation guide states, and what patent owner fails to mention is referenced on Appendix 31, is that even though it does say that the router can provide the first line of defense, it often is not used to protect the internal network. It says not typically used, although you can configure... What are you reading from? So this is the first paragraph, first full paragraph on Appendix 31, where the board states, patent owner fails to mention that the next sentence of the source fire installation guide states, although you can configure most routers to block unwanted packets, this is not typically used to secure the network segment between the router and the firewall. And so what it's saying is that firewalls can have this function, but it's typically not used in a network protective way. So your first line of defense, actually, in that situation, is the 3D sensor. So, again, the source fire reference we rely upon does have the 3D sensor as the very first device. But even if you look to the installation guide and to its configurations here, the router is typically not used to protect the network segment. So, therefore, it was reasonable to conclude, especially on an obviousness ground, that the 3D sensor is the device that's protecting the network. The router does not have a protective function in that regards. The board went on to explain that based on this disclosure, the patent owner's argument that the placement of the 3D sensor between the firewall and the router indicates that the 3D sensor is on the protected side of the network is unavailing. Because, again, the router is not providing a protective function. That's on Appendix 31. And so it was free based on the evidence to conclude that where the source fire installation guide expressly says the router does not provide a protective function, it is not acting as the boundary between the protected and unprotected networks. Even if the router had some function, that would be completely consistent with Figure 2A of the patent. So what does Figure 2A of the patent show? This is Appendix 78. This is Figure 2A of the 413 patent. So Appendix 78, you have the packet filtering device. That is Element 144. Between it and Network D, which is the unprotected network, there are network devices and, optionally, a tap. The specification is Appendix 105, Columns 3, 47 to 58, to make clear that the tap is optional. And then it's the network devices, which include things like routers, that are interfacing between Network D, the unprotected network, and Network A, the protected network. So even within the context of the 413 patent, Figure 2A, which both parties agree is an embodiment of what is claimed, show that the packet filtering device, which is at the boundary in Figure 2A, still is behind Network Devices 202, which includes such things as a router. So we know it's permissible, and within the scope of the claims, to have a packet filtering device at a boundary of a protected and unprotected network, even if it is not the first network device in that configuration. And I'll just turn, again, to Appendix 105, which is the explanatory text for that figure. And this is at Column 3, starting at lines 47. It says that the packet filtering device may be located at Boundary 150 between Networks 102 and 108. It goes on to say that Network Devices 202 are what interface the hosts 110, 112, and 114 of the protected network with Network 108 of the unprotected network. So just to summarize what we have here, we have express disclosure in SourceFire of the 3D sensor, the packet filtering device, being the very first device between the unprotected network and the protected network. In the installation guide, we have disclosure that the router, if it's there, does not always provide, typically does not provide any network protective function. So even from the installation guide, the Board had substantial evidence to conclude that even in those configurations, the 3D sensor is providing the first line of defense and therefore is at the boundary. Do you want to discuss the relevance of the Macaulay? The Macaulay reference? Sure. So the panel didn't address this, but Macaulay is brought in for the teachings of the scoring elements of the claims. And so what the claims require, and what those claims require, is ranking network threat indicators based upon various criteria. Among them, the independent claims is a number of network threat intelligence providers that had identified that network threat identifier. And then there are dependent claims that add additional criteria. Macaulay teaches this exact same sort of ranking system, identifying the number of cyber threat intelligence providers that identified certain network threat identifiers, and using that numbering and other criteria disclosed in the system of source FHIR. What source FHIR discloses is a system that, it's a network protective device, it is an IPS, intrusion prevention system. When it sees a packet of interest, it will block it or allow it, and then it will log that information. And what source FHIR discloses is that a network administrator can set a priority level, high, medium, or low, for these detected events, which is not a particularly granular sort of identification of the threat. And it doesn't give any indication, source FHIR, of how to set the priority. It leaves it up to the administrator, high, medium, or low. And so what our petition was based upon, and what our expert explained, was that a person that were in a schoolyard would look to the teachings of Macaulay about ranking threats and implementing the priority levels of source FHIR. It provides multiple benefits, including a more granular identification beyond just high, medium, and low. Though an expert admitted that in the source FHIR system, you may have hundreds and hundreds of pages of high-ranked events. And so this more granular teaching of how to rank events would have led Posita to be motivated to apply Macaulay's teaching to source FHIR. So the board then cited Dr. Lee's testimony in its final written decision. It cited it throughout its final written decisions on motivation to combine. Dr. Lee's testimony at paragraphs 117 and 118 of his declaration. Those are appendix 1194, 1195. It spent 10 pages, actually 11 pages, of its final written decision discussing the motivation to combine, analyzing the arguments, with two and a half pages of findings. Those findings cite to Dr. Lee's testimony, again at paragraphs 117 and 118 of his report. That's substantial evidence supporting their findings of motivation to combine. They rejected reliance on their expert, and they credited our expert's opinions. I think that supports the board's decision. Did the board ever address the language about you must isolate the 3D sensors at 9252? The board did not, I believe, address that expressly in its opinion, but I think that this was discussed at the hearing, and I think what's critical about it is two points. One, if you look at the installation here, all of the 3D sensors are within the firewall. So we're talking about specifically the configuration where the 3D sensors are within the firewall. And as we know from what the board did discuss, this is the figure at appendix 9243, there are other configurations where the 3D sensor is outside the firewall. This is talking about a specific configuration where all the 3D sensors are within the firewall, so it's within the protected network in that configuration, and you have a multiple site deployment. In that specific configuration, internal 3D sensors, multiple site deployments, and you're communicating with this thing called a defense center, which is an aggregator of information from a 3D sensor. You don't want to transmit information between the 3D sensor and the defense center through the open internet. So you would acknowledge, though, that this document can only be read as indicating in those limited instances, at least, you must isolate the 3D sensors and the defense center from the unprotected networks. If you want to secure the data. You don't have to, but if you want to secure the data, which one would reasonably want to do, then you have to, in that specific deployment. So what do we make of the fact that, first of all, is there evidence, what you're saying makes sense to me, but is there evidence that that is how one of Skilner would read this document, and what do we make of your concession that the board never addressed this point? This was never presented as part of the grounds. This is a separate document. We relied upon the source fire user manual as our grounds. They raised this as a different document. This is not part of the obviousness, correct? But it's in the record. It's in the record. So the board was free to credit the evidence that was presented in the petition, which was the actual user guide, which shows that the 3D sensor is the first item between the unprotected network and the protected network. So that's the evidence. It said its relabeling was unpersuasive. It then turned to this other document, and it described that in the context where you have the sensor external to the firewall. But that really said the board would have an obligation, even on substantial evidence review, to consider the evidence that maybe cuts against its findings. So I'm concerned with how we can just... how we can ignore the fact that the board ignored this evidence. Well, I think because it focused... I don't think it ignored the evidence. It focused on the deployment, as shown in 9243, where the 3D sensor is external to the firewall. And it did not discuss the other deployments because that was irrelevant to the arguments. The deployments where it's within the firewall, we would acknowledge that may be within the protected network. And all that the... on Appendix 9252, the 3D sensor is always, in that figure, in that deployment, within the internal network. That was not what was discussed as part of the arguments. The argument's always about what does it mean when the 3D sensor on 9243 is external to the firewall? And so that's what was relevant. And that's what the board was addressing about their arguments. And do we have the pages of the oral argument that you're referring to where this issue was discussed with the board? There are some of the pages of the... there are pages from the oral argument in the record at Appendix... this is Appendix 707 through 743 where there is discussion about the installation guide. But what's not in here is the discussion about the source fire manual, user guide that we're relying upon that shows it's the first device. Right, at page 721 is the sentence, to secure the data, you must isolate a 3D sensor and defense center from the unprotected networks. That was council's argument at Appendix 721. That's right. That was council's argument. There's not expert testimony saying that that configuration applied in all circumstances to the installation guide. So it was an attorney argument. The board was free to credit it or not. And it did not credit that argument. Particularly in the context where the source fire user guide explicitly shows that the 3D sensor is the very first device between the unprotected internet and a protected network. And the board found their relabeling to be an unavailing argument. Thank you, Mr. Bradge. Thank you, your honors. Mr. Hanna has some more bubble time. Yes, thank you very much, your honors. Judge Stark, I think you hit it on the head. We don't know what the board is going to say about this document. The must language was one of the key pieces of evidence that was relied upon throughout this proceeding. It was cited in our patent owner response. It was doubled down in our SIR reply. And I would say almost half of the oral hearing was discussing that document. And discussing that specific language that says you must isolate the sensors. All we have now is attorney arguments saying okay, maybe there might be different deployments of what you can and cannot do. We don't have the board's reasoning or explaining this away. And we're entitled to that. And frankly, your honors are entitled to that in order to make a decision as to whether that is a sound decision. I mean, this was put up as one of our first slides in the oral hearing. Everyone was talking about this language. When we get the final written decision, it was completely silent. We need an explanation. At the very least, we need a remand back to the board for them to try to justify why when the installation manual says you must isolate the 3D sensors from unprotected networks, why is that phrase irrelevant? Especially when it almost uses the exact language of the claims. We need a reason. Quickly, I'll address some of the other citations to the record that council discussed. On APX 27, they referenced that portion of the appendix saying that this is where the board contended that their drawing was a mislabeling. If you actually look at appendix 27, the board says the patent owner's arguments are unavailing. But then it discusses the patent. It never said that the drawings that the petitioner did were correct. Maybe I'm wrong about this. The sentence, patent owner's arguments are unavailing, refers to what was just recited in patent owner's arguments before that. That includes, is that on page 26, about 10 lines up from the bottom, a string site, which includes, I think, that drawing, which is page 235, wasn't it? 1526, isn't that the figure? You're talking about appendix 27? No. I'm talking about appendix, I'm sorry, on page 27 of the appendix. The sentence, patent owner's arguments are unavailing, that's on appendix 27. Correct. What that is rejecting is what has just been described, which is a, what kind of, two paragraphs, one very long paragraph, one very short paragraph, and it's included in that material, isn't it? This argument that you made about the mislabeling of this key drawing. I agree with you that those arguments are within that, but I think what the board here is this is where they change their definition of the boundary, and they're trying to say that you can actually be at a boundary within a protected network. Because what they, if you look at the following paragraphs, they start to try to justify their opinion based on the specification. The board never explicitly states that their drawing was correct, or their drawing was wrong, in fact. I mean, they just, they left that one out there as well. We have no record to support that either way. With regard to, This is your final concluding summary sentence? Okay. I'll turn to, So on page 1526, we have that picture that we talked about with the network traffic, and the router, and then the host on the bottom. If you look at the caption underneath, it consistently refers to your network traffic, your traffic on your network, and so when it has that bubble that says network traffic, that's not internet network traffic. That's your network traffic, the traffic of your internal network. Thank you, counsel, and the case is submitted. Thank you, Your Honor.